UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
EMA FINANCIAL, LLC,

                              :       <u>OPINION & ORDER</u>

            Plaintiff,

                              :       19 Civ. 1545 (GWG)

     -v.-

                              :

VYSTAR CORP.,                       :

            Defendant.       :
------------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

     EMA Financial, LLC ("EMA") brought this suit against Vystar Corp. ("Vystar") for

breach of contract. <u>See</u> Complaint, filed Feb. 19, 2019 (Docket # 1) ("Comp."). Vystar has

counterclaimed for breach of contract, unjust enrichment, and a declaratory judgment that the

loan agreement at issue is unconscionable and unenforceable. <u>See</u> Amended Answer,

Affirmative Defenses and Counterclaims, filed Apr. 16, 2020 (Docket # 60) ("AAC"). EMA has

moved for summary judgment on its breach of contract claim and for dismissal of Vystar's

counterclaims.[1] Vystar has moved for summary judgment in favor of its counterclaims and for

dismissal of EMA's claim for breach of contract.[2]

---

    [1] Notice of Motion, filed May 24, 2022 (Docket # 194) ("EMA Mot."); EMA's
Memorandum of Law in Support, filed May 24, 2022 (Docket # 202) ("Pl. Mem."); Declaration,
filed May 24, 2022 (Docket # 200) ("Preston Decl."); Vystar's Memorandum of Law in
Opposition, filed June 29, 2022 (Docket # 207) ("Def. Opp."); EMA's Reply Memorandum of
Law, filed July 29, 2022 (Docket # 221) ("Pl. Reply"). EMA filed two essentially identical reply
briefs (Docket ## 218 and 221) as explained in Docket # 222.

    [2] Notice of Motion, filed May 24, 2022 (Docket # 191) ("Vystar Mot."); Vystar's
Memorandum of Law in Support, filed May 24, 2022 (Docket # 199) ("Def. Mem.");
Declaration of Steven Rotman, filed May 24, 2022 (Docket # 193) ("S. Rotman Decl.");
Declaration of Barry M. Bordetsky, filed May 24, 2022 (Docket # 198) ("Bordetsky Decl.");
Declaration of Daniel Roche, filed May 24, 2022 (Docket # 195); EMA's Memorandum of Law
in Opposition, filed June 29, 2022 (Docket # 215) ("Pl. Opp."); Declaration of Jeffrey
Fleischmann, filed June 29, 2022 (Docket # 211) ("Fleischmann Decl."); Vystar's Reply

On January 6, 2023, the Court held oral argument on the motions and issued rulings with respect to certain issues raised by the parties.  See Transcript, filed Jan. 17, 2023 (Docket # 231) ("Tr.").  It also directed the parties to supplement their briefing in accordance with those rulings. See id.  Both EMA and Vystar supplemented their briefing as directed.[3]

The loan agreement at issue in this case is complex.  Each side has raised a number of issues in an effort to justify its position that the agreement either has or has not been breached by the other side, or that some other principle affects the enforcement of the agreement.  We address in this Opinion and Order only those issues, whether presented as claims or defenses, that are necessary to determine whether either party is entitled to summary judgment.

For the reasons stated below, the Court denies EMA's motion for summary judgment and grants Vystar's motion for summary judgment.

I.      BACKGROUND

The following facts are not in dispute unless otherwise noted.

A.  Facts

---

Memorandum of Law, filed Aug. 1, 2022 (Docket # 225).  Docket # 225 is a corrected version of Docket # 219 as explained in Docket # 224.

[3]  See Supplemental Declaration of Felicia Preston, filed Feb. 24, 2023 (Docket # 235) ("Preston Supp. Decl."); Declaration of Jeffrey Fleischmann, filed Feb. 24, 2023 (Docket # 236); EMA's Supplemental Memorandum of Law, filed Feb. 24, 2023 (Docket # 237) ("EMA Supp. Mem."); Vystar's Supplemental Memorandum, filed Feb. 24, 2023 (Docket # 238) ("Vystar Supp. Mem."); Third Declaration of Barry M. Bordetsky, filed Feb. 24, 2023 (Docket # 239); Third Declaration of Daniel Roche, filed Feb. 24, 2023 (Docket # 240) ("Roche Supp. Decl."); Second Declaration of Greg Rotman, filed Feb. 24, 2023 (Docket # 241); Supplemental Declaration of Felicia Preston, filed Mar. 15, 2023 (Docket # 242); Vystar's Supplemental Reply, filed Mar. 15, 2023 (Docket # 243) ("Vystar Supp. Resp."); EMA's Supplemental Reply, filed Mar. 15, 2023 (Docket # 244) ("EMA Supp. Resp."); Vystar Letter, filed Oct. 30, 2023 (Docket # 248) ("Vystar Supp. Letter").

EMA is a Delaware limited liability company with a place of business in New York. Comp. ¶ 2. Vystar is a Georgia corporation with its principal place of business in Massachusetts. Id. ¶ 5. On January 29, 2018, EMA and Vystar executed a Note and a corresponding Securities Purchase Agreement. See Note, annexed as Ex. 3 to S. Rotman Decl. (Docket # 193-3) ("Note"); Securities Purchase Agreement, annexed as Ex. 4 to S. Rotman Decl. (Docket # 193-4) ("SPA"); Parties' Rule 56.1 Joint Statement of Undisputed Facts and Stipulated Documents, filed May 24, 2022 (Docket # 201) ("Joint 56.1 Stat."), at ¶¶ 1.i-ii. The Note's stated value is $80,000 and provides that in exchange for a payment of $75,500 from EMA, Vystar promises to pay back EMA $80,000 pursuant to the Note's terms. Note at 1; SPA ¶¶ 1.a, 1.b. Under the terms of the Note, EMA's transfer of $75,500 by wire transfer satisfied its obligation for payment to Vystar, and thus reflects an immediate $4,500 "discount" for EMA from the $80,000 Note price. Note at 1; SPA ¶¶ 1.a, 1.b.

The SPA provides that the "Closing Date" of this transaction will occur on the first business day after the execution of the SPA or "such other mutually agreed upon time." SPA ¶ 1.c. The Note specifies that its "Issue Date" is January 29, 2018. See Note at 1. The Note states that Vystar promises to pay the $80,000 back by the "Maturity Date" of January 29, 2019, and that EMA may extend the maturity date with proper notice to Vystar. See id. As for repayment of the loan amount prior to the maturity date, the Note provides that 180 days after the Issue Date, EMA may collect on its loan by converting "all or any part of the outstanding amount due under" the Note into shares of Vystar's stock, as opposed to an ordinary cash repayment of the loan. Note § 1.1.

The Note specifies the protocol EMA and Vystar are to follow to give effect to the "Conversion Right," see id., and requires Vystar to ensure the existence of a sufficient reserve of

stock shares to satisfy conversion of the Note in full, id. § 1.3.  The Note further specifies that Vystar is to guarantee this share reserve by reserving common stock in EMA's name with a "Transfer Agent," who is instructed to issue shares to EMA when EMA seeks to convert the funds EMA loaned.  See id.; SPA ¶ 5.  If Vystar wants to change the transfer agent, the Note requires Vystar to provide the new proposed transfer agent an executed "Irrevocable Transfer Agent Instructions" form that delineates the transfer agent's obligations to EMA.  See Note § 3.15; SPA ¶¶ 5, 9.c.

Although the parties executed the Note and SPA on January 29, 2018, EMA did not transfer the $75,500 loan amount to Vystar at that time because Vystar had not sufficiently reserved shares.  See Joint 56.1 Stat. ¶¶ 9, 13; Preston Decl. ¶ 4; Note § 1.3.  In a March 6, 2018 email exchange between Greg Rotman, the principal person from Vystar for this transaction, and Byron Campos of EMA, Rotman described the funding from EMA as "on hold."  See Emails, annexed as Ex. E to Preston Decl. (Docket # 200-5) ("Emails"), at *2, *7;[4] Joint 56.1 Stat. ¶ 10.  Later that day Rotman sent EMA a "joint written consent" from Vystar's shareholders and board, which increased the number of shares available to meet Vystar's reserve obligations under the agreement.  See Emails at *2-6.  After Vystar's fulfillment of the reserve requirement, EMA funded the note on March 8, 2018, by wiring $72,300 to Vystar's Bank of America account.  See Wire of $72,300, annexed as Ex. 5 to S. Rotman Decl. (Docket # 193-5) ("Mar. 8, 2018 Wire").  The payment of $72,300, rather than the anticipated $75,500 payment, reflected an additional $3,200 deduction purportedly permitted by paragraph 10.d of the SPA for "fees, costs and expenses . . . incurred by [EMA] in connection with [EMA]'s due diligence and negotiation, preparation and execution of" the agreement.  See SPA ¶ 10.d.

---

[4] "* __ " indicates the page number supplied by the ECF system.

EMA ran interest on the loan from the Note's Issue Date of January 29, 2018, see Joint 56.1 Stat. ¶¶ 9, 13, 38, at the 12% annual interest rate provided for by the Note, see Note at 1. On September 11, 2018, EMA began collecting repayment by utilizing the stock conversion option of the Note.  See Sept. to Jan. 9 Notice of Conversions, annexed as Ex. 7 to S. Rotman Decl. (Docket # 193-7) ("Sept. to Jan. 9 Notice of Conversions"), at *1; Joint 56.1 Stat. ¶ 40. Each stock conversion by EMA is reflected in a document labeled "Notice of Conversion," which lists the date of the conversion, the amount of money to be converted into stock, and what portion of this amount EMA was attributing to principal on the loan, interest, and/or "applicable fees."  See Sept. to Jan. 9 Notice of Conversions.  "Applicable fees" includes $750 attributed to each conversion for "an attorney opinion letter" that the Note provides EMA can charge for each conversion notice.  See Joint 56.1 Stat. ¶ 16; Note § 1.2(a).  Applicable fees for each conversion also includes the conversion by EMA of whatever fees are charged by Vystar's "transfer agent" to facilitate the conversions.  See Joint 56.1 Stat. ¶ 16; Note § 1.4(i).  For the first conversion, the applicable fees were $850, see Sept. to Jan. 9 Notice of Conversions at *1, which consisted of the $750 attorney opinion letter cost and $100 in transfer agent fees.  See Chart of Conversions, annexed as Ex. K to Preston Decl. (Docket # 200-11) ("EMA Chart of Conversions") (row C1).

On September 18, 2018, Vystar did not maintain the adequate level of reserve stock and did not honor a request by EMA to fix the issue.  Joint 56.1 Stat. ¶ 41.  EMA thereupon informed Vystar that this action triggered an event of default under the Note.  See Emails, annexed as Ex. 5 to Declaration of Felicia Preston in Opposition (Docket # 214-5), at *5 ("Sept. 18, 2018 Email").  On that same day and again on September 20, 2018, EMA converted more stock successfully.  See Sept. to Jan. 9 Notice of Conversions at *2-3.  Each of those conversions following Vystar's failure to maintain adequate reserve shares reflects that EMA began to apply

the default interest rate of 24% to the loan, rather than the regular interest rate of 12% as it had

done previously.  See EMA Chart of Conversions.  On October 3, 2018, EMA informed Vystar

that, according to the transfer agent, there were no reserve shares available and that EMA

considered Vystar to be in default.  See Emails at *13.  On October 4 and 18, 2018, EMA sent its

fourth and fifth notices of conversion, both of which were honored.  See Sept. to Jan. 9 Notice of

Conversions at *4-5.

On October 23, 2018, Vystar switched its transfer agent and did not provide notice to

EMA.  Joint 56.1 Stat. ¶ 46.  On November 7, 2018, EMA sent its sixth notice of conversion,

which was honored.  See Sept. to Jan. 9 Notice of Conversions at *6.  On December 11, 2018,

EMA sent its seventh notice, which was honored.  See id. at *7.  On December 20, 2018, EMA

extended the maturity date of the Note, which was originally due January 29, 2019, to January

29, 2020.  See Maturity Extension Letter, annexed as Ex. 6 to S. Rotman Decl. (Docket # 193-6).

On January 3, 2019, EMA sent its eighth notice, and on January 9, 2019, EMA issued its ninth

notice.  See Sept. to Jan. 9 Notice of Conversions at *8-9; Joint 56.1 Stat. ¶ 53.  Vystar honored

all nine of these notices.  Joint 56.1 Stat. ¶ 52.

In each one of the first eight notices, EMA claimed to be converting only principal due

on the Note and the associated costs, and did not purport to convert any accrued interest into

stock.  See EMA Chart of Conversions (rows C1-C8).  On the ninth notice, however, EMA

converted $4,500 into stock, with $1,050 attributed to fees and $3,450 to the amount owed on the

Note.  See Sept. to Jan. 9 Notice of Conversions at *9.  The remaining balance of the Note was

listed as $3,572.74.  Id.  This ninth notice reflects a principal balance on the Note of $37.50 prior

to that conversion.  See EMA Chart of Conversions (row C9); Joint 56.1 Stat. ¶ 53.  The

successful conversion of this ninth notice, therefore, meant that EMA had converted the full

principal amount of the $80,000 value of the Note and for the first time had converted any interest that had accrued.  EMA Chart of Conversions (rows C9-C10).  The remainder Vystar owed on the Note after the ninth conversion was solely accrued interest, which the ninth notice of conversion reflected was $3,572.74.  Sept. to Jan. 9 Notice of Conversions at *9.

On January 15, 2019, EMA sent its tenth notice, seeking to convert $3,572.74 in interest along with $1,050 in fees.  Jan. 15 Notice of Conversion, annexed as Ex. 9 to S. Rotman Decl. (Docket # 193-9) ("Jan. 15 Notice of Conversion").  Vystar did not honor this notice of conversion.  See Joint 56.1 Stat. ¶¶ 56-57.

On January 25, 2019, Vystar wrote EMA saying it calculated the remaining interest on the Note as $4,623 and offered to settle the Note and any claims by EMA for either 500,000 shares of common stock in Vystar or $4,623 in cash, at EMA's option.  Emails from Mike Refolo to Jamie Beitler dated Jan. 25 and Jan. 31, 2019, annexed as Ex. 6 to Bordetsky Decl. (Docket # 198-6) ("Refolo-Beitler Emails"), at *1-2.  While there is no evidence that EMA accepted the offer, on January 30, 2019, Vystar wired EMA $4,658 in cash.  See Wire of $4,658, annexed as Ex. 10 to S. Rotman Decl. (Docket # 193-10) ("Jan. 30, 2019 Wire"); Bank Statement, annexed as Ex. H to Preston Decl. (Docket # 200-8) ("EMA Bank Statement").  On January 31, 2019, EMA wrote back to Vystar saying it was rejecting the payment and would wire it "to our attorney's escrow account to hold custody until such time as you satisfy the Note with prompt delivery of the shares that you are required to deliver pursuant to our Notice of Conversion."  Refolo-Beitler Emails at *3.

On February 5, 2019, EMA submitted its eleventh notice to convert $903.79 in interest and $1,050 in applicable fees, which Vystar did not honor.  See Feb. 5 Notice of Conversion,

annexed as Ex. 11 to S. Rotman Decl. (Docket # 193-11); Joint 56.1 Stat. ¶ 67.  EMA filed this

lawsuit on February 19, 2019.  See Comp.

     B.  Procedural History

     In its complaint against Vystar, EMA alleged breach of contract, see Comp. ¶ 1, and

sought specific performance, a permanent injunction, and attorney's fees and costs, see id. at 12-

13.  The district court granted Vystar's motion to dismiss the claims for specific performance and

a permanent injunction.  See Opinion, filed Mar. 13, 2020 (Docket # 49).

     In its amended answer, Vystar alleged counterclaims against EMA for breach of contract

and unjust enrichment.  See AAC at 31.  It also sought a declaratory judgment that the

underlying agreement was void for unconscionability, that EMA violated federal securities law

as an unregistered dealer, and that EMA violated § 10(b) of the 1934 Exchange Act and Rule

10b-5 through misrepresentation and market manipulation.  See id. ¶¶ 184-203.  Vystar's

amended answer also pleaded a number of affirmative defenses, including unclean hands,

waiver, estoppel, accord and satisfaction, unconscionability, that EMA acted as an unregistered

broker dealer, and that EMA's claims sought to enforce an impermissible liquidated damages

provision.  See id. ¶¶ 71-73, 78.  Following a motion to dismiss by EMA, the district court

dismissed Vystar's broker-dealer defense and counterclaim.  See Opinion, filed Mar. 29, 2021

(Docket # 116), at 3.  Vystar voluntarily withdrew its market manipulation claim.  Notice of

Withdrawal, filed Dec. 14, 2021 (Docket # 165).

     On May 24, 2022, the parties filed the instant motions for summary judgment.  EMA

filed a motion for summary judgment under Fed. R. Civ. P. 56 seeking judgment on its breach of

contract claim and dismissal of Vystar's counterclaims and affirmative defenses.  See EMA Mot.

Vystar filed its own motion for summary judgment seeking dismissal of the breach of contract

claim and seeking judgment "in favor of Vystar on its counterclaims of breach of contract, unjust enrichment, a declaration the underlying agreements are void as unconscionable, for attorneys' fees and damages," and the dismissal of EMA's claims for breach of contract and legal fees.  See Vystar Mot.

### C.  January 6, 2023 Oral Argument

Following the briefing of the motions for each side, the Court held oral argument on January 6, 2023, at which it decided some issues the parties had raised and that we describe in section III.B below.  See Tr.  The parties then supplemented their summary judgment motions based on the rulings at this oral argument.  See EMA Supp. Mem.; Vystar Supp. Mem.; EMA Supp. Resp.; Vystar Supp. Resp.

### D.  October 27, 2023 Oral Argument

After the parties filed the supplemental briefing requested at the January 6, 2023 oral argument, the Court held another oral argument on October 27, 2023, at which the issue of materiality of EMA's breach was discussed, as well as damages.  See 10/27 Tr., filed Nov. 7, 2023 (Docket # 249).  The Court did not make any rulings at that time.

## II.  LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENT[5]

Rule 56(a) of the Federal Rules of Civil Procedure provides that a court shall grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a

---

[5]  While EMA's notice of motion seeks dismissal of Vystar's counterclaims and affirmative defenses under "Rule 12," see EMA Mot., EMA's memorandum of law does not cite to any law relating to this rule or apply Fed. R. Civ. P. 12 to any claims in this case.  Thus, we view the motion as arising only under Fed. R. Civ. P. 56.

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed," and the court must draw "all justifiable inferences" in favor of the nonmoving party. Id. at 255 (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-159 (1970)); accord Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001) ("[A]ll reasonable inferences must be drawn against the party whose motion is under consideration.").

Once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (citation and punctuation omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir.

2010) (quoting <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)).

III.    <u>DISCUSSION</u>

We first discuss the law applicable to the breach of contract claims.  We next describe the pertinent rulings already made in the case during the January 6, 2023 oral argument.  We conclude by addressing the remaining arguments of the parties to the extent they are relevant to the disposition of the motions.

A.  <u>Delaware Law on Breach of Contract</u>

Both the Note and the SPA provide that they are governed by Delaware law.  Note § 4.6; SPA ¶ 10(a).  To succeed on a breach of contract claim under Delaware law, the moving party must show "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."  <u>VLIW Tech., LLC v. Hewlett-Packard Co.</u>, 840 A.2d 606, 612 (Del. 2003) (citations omitted).  As the Supreme Court of Delaware has recently summarized:

> Delaware law adheres to the objective theory of contracts, <u>i.e.</u>, a contract's construction should be that which would be understood by an objective, reasonable third party. When interpreting a contract, this Court will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions. Furthermore, a court must determine the intent of the parties from the language of the contract.  This approach places great weight on the plain terms of a disputed contractual provision, and we interpret clear and unambiguous terms according to their ordinary meaning.  Courts should also assure that all contract provisions are harmonized and given effect where possible.  We do not consider extrinsic evidence unless we find that the text is ambiguous.  Ambiguity is present only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.  Critically, a contractual provision is not rendered ambiguous simply because the parties in litigation differ as to the proper interpretation.

Samuel J. Heyman 1981 Continuing Tr. for Lazarus S. Heyman v. Ashland LLC, 284 A.3d 714, 721 (Del. 2022) (citations and punctuation omitted).

    B.  <u>January 6, 2023 Rulings</u>

        1.  <u>Running Interest from the Issue Date</u>

      The parties dispute what date interest should have started running on the Note.  EMA calculated interest as running from the date the parties first executed their agreement, January 29, 2018.  <u>See</u> EMA Chart of Conversions; Pl. Mem. at 3.  Vystar contends that EMA should have only started running the interest on the principal once EMA actually wired the funds to Vystar's bank account, <u>see</u> Def. Mem. at 13, which did not occur until March 8, 2018, <u>see</u> Mar. 8, 2018 Wire.

      The Note recites an "Issue Date" of January 29, 2018, and the opening paragraph provides:

> FOR VALUE RECEIVED, VYSTAR CORP, INC., a Georgia corporation ("Borrower" or "Company"), hereby promises to pay to the order of EMA FINANCIAL, LLC, a Delaware limited liability company, or its registered assigns (the "Holder"), on January 29, 2019, (subject to extension as set forth below, the "Maturity Date"), the sum of $80,000.00 as set forth herein, together with interest on the unpaid principal balance hereof at the rate of twelve (12%) per annum (the "Interest Rate") <u>from the date of issuance hereof</u> until this Note plus any and all amounts due hereunder are paid in full, and any additional amounts set forth herein, including without limitation any Additional Principal (as defined herein). . . .

Note at 1 (emphasis added).  The unambiguous language of the contract compels the finding that interest ran from the January 29, 2018 "Issue Date."  Thus, EMA's charging of interest from January 29, 2018, was not a breach of contract.  <u>See also</u> Tr. 27:12-14.

        2.  <u>The $3,200 Legal Fees Deduction</u>

As already noted, although the Note has a face value of $80,000, the SPA provides a "discount" to EMA by requiring it to pay only $75,500 to Vystar.  See SPA ¶ 1.a.  The $4,500 discount is not in dispute.  However, EMA used a separate provision of the SPA to reduce the funding provided to Vystar by an additional $3,200, see SPA ¶ 10.d, which resulted in a cash payment to Vystar of $72,300 for the Note, see Mar. 8, 2018 Wire.  Vystar contends that EMA improperly deducted this $3,200, which meant that EMA was not entitled to convert $80,000 worth of shares to repay itself, but only $76,800.  See Def. Opp. at 16-17.

The relevant provision of the SPA provides:

> On or prior to the Closing, the Company shall pay or reimburse to Purchaser a non-refundable, non-accountable sum equal to $3,200.00 as and <u>for the fees, costs and expenses</u> (including without limitation legal fees and disbursements and due diligence and administrative expenses) <u>incurred by the Purchaser</u> in connection with the Purchaser's due diligence and negotiation, preparation and execution of the Transaction Documents and consummation of the Transactions. The Purchaser may withhold and offset the balance of such amount from the payment of its Purchase Price otherwise payable hereunder at Closing, which offset shall constitute partial payment of such Purchase Price in an amount equal to such offset.

SPA ¶ 10.d (emphasis added).  Vystar argues that EMA never proved that it actually paid $3,200 for the expenses listed.  See Def. Mem. at 14 ("Not one document was produced in discovery supporting any such fees or expenses.").

As was stated in the oral argument, we hold that EMA did not breach the contract when it made the $3,200 deduction.  See Tr. 27:4-11.  As an initial matter, there is evidence that EMA had actually incurred these fees.  See, e.g., Transcript – Felicia Preston Deposition, annexed as Ex. F to Fleischmann Decl. (Docket # 211-6), at 26-31.  More to the point, it was not necessary to consider such evidence because nothing in the provision suggests that EMA had some obligation to prove that it incurred these costs.  The language of the provision specifically states

that the deduction was "non-accountable."  See SPA ¶ 10.d.  Additionally, there is no mechanism in the Note that allows Vystar to seek proof of these costs.

Accordingly, EMA did not breach the contract by deducting the $3,200.  See Tr. 27:4-11.

### 3.  Whether EMA Settled Any Dispute By Accepting the Wire of $4,658

Vystar asserts that even if the Court were to find that it breached the contract, EMA accepted Vystar's offer to settle when EMA retained the $4,658 wire transfer.  See Def. Mem. at 9, 24-25; Jan. 30, 2019 Wire; see also AAC ¶ 73 (asserting "satisfaction and accord" as an affirmative defense).  EMA disputes this argument, see Pl. Reply at 14-15, and further argues that Vystar's sending of the payment reflected a breach of the Note's prohibition on pre-payment, see Pl. Opp. at 33-34.

Under Delaware law, courts must consider whether the party seeking to enforce a purported settlement agreement has proven the existence of a contract to settle by a preponderance of the evidence.  See Whittington v. Dragon Grp. L.L.C., 2013 WL 1821615, at *3 (Del. Ch. May 1, 2013).  The contract law principles of acceptance require "'[a]n overt manifestation of assent, not subjective intent.'"  Price v. State Farm Mut. Auto. Ins. Co., 2013 WL 1213292, at *6 (Del. Super. Ct. Mar. 15, 2013) (quoting Acierno v. Worthy Bros. Pipeline Corp., 693 A.2d 1066, 1070 (Del. 1997)).  Here, while EMA retained the funds in an escrow account, it expressly rejected the funds as a payment due under the Note.  See Refolo-Beitler Emails at *3 ("Such payment is rejected, the Note has not be [sic] satisfied, and the monies have been wired to our attorney's escrow account to hold custody until such time as you satisfy the Note with prompt delivery of the shares that you are required to deliver pursuant to our Notice of Conversion.").  The Court finds these circumstances distinguishable from those in the cases cited by Vystar.  See, e.g., Price, 2013 WL 1213292, at *6 (retention of funds combined with the

14

response "it's about time" and a lack of communication for fourteen months proved sufficient manifestation of acceptance). Accordingly, we reject the assertion by Vystar that EMA's failure to return the January 30, 2019 Wire amounted to a settlement or waiver of any claim. See also Tr. 58:19-22. As described further in section III.C.3 below, however, this payment in fact satisfied the amount due on the Note at the time of the payment, even if it did not reflect any settlement by EMA of its claims.

### 4. Unconscionability

In its amended answer, Vystar pleaded a counterclaim seeking a declaratory judgment that (1) under Delaware law, "the underlying agreements are unconscionable," (2) "the underlying agreements are unenforceable and/or portions are unenforceable, such as the liquidated damages sections," and (3) "to the extent the agreement is enforceable, Vystar in good faith requests the Court declare: (i) the legal fee provisions of the agreements be mutual." See AAC ¶¶ 216-217.[6] The parties dispute whether Vystar could void the contract on the grounds of unconscionability. See Def. Mem. at 26-29; Pl. Opp. at 37-42.

Under Delaware law, there is no possible argument Vystar could make in these circumstances to establish unconscionability. See Tr. 58:16-19. Delaware requires a court to consider both procedural and substantive unconscionability. See Chemours Co. v. DowDuPont Inc., 2020 WL 1527783, at *12 (Del. Ch. Mar. 30, 2020), aff'd, 243 A.3d 441 (Del. 2020) ("Procedural and substantive unconscionability are not 'separate elements of a two prong test'—

---

[6] Vystar has also asserted unconscionability as an affirmative defense. See AAC ¶ 78. As Judge Carter previously noted, whether unconscionability is an affirmative defense or a counterclaim "appears to be an open question." EMA Financial, LLC v. Vystar Corp., Inc., 2021 WL 1177801, at *7 (S.D.N.Y. Mar. 29, 2021) (quoting Red Fort Capital, Inc. v. Guardhouse Prods. LLC, 397 F. Supp. 3d 456, 475 (S.D.N.Y. 2019)). The Court need not resolve this issue, however, given that Vystar's unconscionability argument fails on the merits.

instead, the 'analysis is unitary, and it is generally agreed that if more of one is present, then less of the other is required.'") (citations omitted).  We have examined the factors used by Delaware courts to determine unconscionability, see Fritz v. Nationwide Mut. Ins. Co., 1990 WL 186448, at *4-5 (Del. Ch. Nov. 26, 1990), and conclude that none of them would require voiding the parties' agreements.  Each party had its own representatives who conducted negotiations over the terms of the contracts.  See Joint 56.1 Stat. ¶ 10 (Vystar's "principal person" in the transaction was a consultant named Greg Rotman).  Although the contracts were largely derived from EMA's form, Vystar was able to review and negotiate changes (which it apparently did). Transcript – Gregory Rotman Deposition, annexed as Ex. C to Fleischmann Decl. (Docket # 211-3), at 112-116 (discussing apparent changes to the documents following review).  "[C]ourts are particularly reluctant to find unconscionability in contracts between sophisticated corporations."  Rsrvs. Mgmt., LLC v. Am. Acquisition Prop. I, LLC, 2014 WL 823407, at *9 (Del. Feb. 28, 2014).  Regarding substantive unconscionability, Vystar has not made a showing that any particular term was so one-sided or onerous as to overcome this conclusion.

Accordingly, Vystar's unconscionability counterclaim is without merit.  See Tr. 58:16-19.  It is not necessary to reach any argument on legal fees since the only legal fee provision at issue, see infra note 11, is mutual.

### 5.  Running Default Interest

The Court views the parties' arguments regarding default interest as raising two separate issues.  The first issue is whether an event of default occurred that triggered the default interest rate of 24%.  The second is whether, upon the occurrence of the event of default, EMA was entitled to charge the default interest rate on the outstanding principal for any unpaid amounts — that is, whether it was permitted to reflect the 24% rate in each of its notices of conversion.

As to the first issue, the Note provides that "[a]ny amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty-four (24%) per annum from the due date thereof until the same is paid ('Default Interest')."  Note at 1.  The first question is whether that 24% interest rate began to run at any time.  If so, we must then determine whether there came a time at which some amount of the Note was "not paid when due."  Id.

EMA began charging the default interest rate on September 18, 2018, the date on which Vystar did not maintain the adequate level of reserve stock and did not honor a request by EMA to fix the issue.  Joint 56.1 Stat. ¶¶ 39, 41.  This failure to maintain adequate reserves meant that Vystar violated § 1.3 of the Note.[7]  The text of § 1.3 provides that any violation of § 1.3 is considered an event of default under § 3.2.  See Note § 1.3 ("If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under Section 3.2 of the Note.").  Section 3.16 provides that upon the occurrence of an event of default under § 3.2, "the note shall become immediately due and payable."  Id. § 3.16 (capitalization omitted).  In other words, the failure to maintain the reserves meant that the note was "immediately due and payable."

Vystar makes no argument that it actually paid the remaining amount due on the Note at that time.  EMA notified Vystar that it was in default.  Sept. 18, 2018 Email.  Although it did not

---

[7] EMA also contends that on October 3, 2018, it informed Vystar that no reserve shares were available and that it was holding Vystar in default, and that on October 23, 2018, Vystar switched its transfer agent without notifying EMA.  See Pl. Mem. at 6; Pl. Reply at 9.  Given that the Court has determined default interest ran from September 18, 2018, these events do not change the outcome.

give an amount due, nothing in the Note specifically requires EMA to give such an amount.[8]
Thus, the 24% interest rate was properly charged on any amounts due and payable as of
September 18, 2023.

As to the second issue, Vystar's argues that: (1) default interest only applies when "[a]ny
amount of principal or interest on this Note which is not paid when due," Note at 1; and (2)
because, following default, Vystar honored every conversion request except the tenth and
eleventh, it "paid" all amounts that it owed when those amounts were "due," see Def. Opp. at 9-
10.  The problem with this argument is that § 1.1 of the Note allows EMA to make conversion
requests of "all or any part" of any "outstanding amount due" under the Note.  There is no
limitation on this right.  Conversion requests were the mechanism available to EMA for seeking
repayment of its loan.  We can find no provision of the Note that prevented EMA from obtaining
payment through the notices of conversion mechanism in the instance where there had been an
event of default.  Additionally, nothing in the Note suggests that if EMA availed itself of this
mechanism, the balance of the Note was no longer "due and payable."  Thus, while Vystar was
paying down the total "due and payable" amount when it honored EMA's conversion requests,
the entire outstanding balance triggered by the event of default was "due" throughout that period.
Therefore, because the balance constituted an "amount of principal or interest on this Note which
[was] not paid when due," Note at 1, EMA was entitled to charge the 24% default interest rate.

In sum, the Court concludes that upon the failure to reserve sufficient shares, the Note
immediately became due and payable, allowing EMA to apply the 24% default interest rate until
the balance due was fully paid.  See Tr. 51:20-52:13.

---

[8] A portion of § 3.16 requires a written notice of an amount due, but that applies only to a
specific type of remedy permitted under § 3.16 called the "Default Amount."  Here, EMA relies
on a portion of § 3.16 (in capital letters) that makes defendants liable for the "Default Sum."

C.  Remaining Issues

    1.  The Proper Method of Conversion

EMA's first eight conversion requests sought to convert stock only to pay down the principal of the loan amount.  See EMA Chart of Conversions (rows C1-C8).  Vystar argues that these conversions constituted a breach of contract because the Note did not permit EMA to convert principal alone without also seeking to convert interest.  See Def. Mem. at 18-22.

In describing how conversions are to take place, the Note specifies that each conversion by EMA is based on a certain "Conversion Amount," which is subject to the following formula:

> The term "Conversion  Amount" means, with respect to any Conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such Conversion, plus (2) accrued and unpaid interest, if any, on such principal amount being converted at the interest rates provided in this Note to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2), plus (4) any Additional Principal for such Conversion plus (5) at the Holder's option, any amounts owed to the Holder pursuant to Sections l.2(c) and l.4(g) hereof.

Note. ¶ 1.1. The Note thus unambiguously requires that both principal and any accrued interest be converted.  It does not provide discretion to EMA to convert principle only and later convert interest on that principal.  See Tr. 27:15-25; Tr. 78:6-11.

As recounted above, EMA only converted amounts owed on the principal of the loan (and applicable fees) in its first eight conversions.  See Sept. to Jan 9 Notice of Conversions at *1-8.  Because EMA's first eight conversions were for only principal and did not include accrued interest, EMA breached the contract by not following the formula specified in the Note.  See Tr. 27:15-25; Tr. 78:6-11.

This failure to comply with the terms of the Note led to the ninth conversion being largely interest.  See EMA Chart of Conversions.  Specifically, in its ninth conversion, EMA converted the final $37.50 in principal owed on the Note, $1,000 in fees, and $3,412.50 in

interest into 20,000,000 shares.  See id. at *9; Joint 56.1 Stat. ¶¶ 53-54; EMA Chart of

Conversions (row C9).  In the tenth and eleventh conversions, EMA sought conversion of only

the outstanding interest balance of $3,572.74, as the principal had been fully paid off following

the ninth conversion.  See EMA Chart of Conversions (rows C10-C11).  The final two

conversions — which were not honored by Vystar — would have corresponded to an additional

26,748,019 shares.[9]  See id.  While we have found that EMA breached the contract, it does not

necessarily follow that the breach excused Vystar's own performance.

    Under Delaware law, "[a] party who first commits a material breach of a contract cannot

enforce the contract going forward."  Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc., 2013

WL 3934992, at *21 (Del. Ch. July 24, 2013) (citing BioLife Solutions, Inc. v. Endocare, Inc.,

838 A.2d 268, 278 (Del. Ch. 2003)).  A material breach is "a failure to do something . . . so

fundamental to a contract that the failure to perform [the] obligation defeats the essential purpose

of the contract or makes it impossible for the other party to perform under the contract."

Tektree, LLC v. Borla Performance Indus., Inc., 2013 WL 5230705, at *4 (Del. Com. Pl. Sept.

16, 2013) (quoting Shore Investments, Inc. v. Bhole, Inc., 2011 WL 5967253, at *5-6 (Del.

Super. Ct. Nov. 28, 2011)).  Following a material breach, the other party's performance under

the contract is excused.  BioLife Sol., Inc., 838 A.2d at 278 ("A party is excused from

performance under a contract if the other party is in material breach thereof.").

    We first consider whether EMA's conversion of principal only in the first eight

conversions amounted to a material breach of the contract, thereby excusing Vystar's

_____

    [9]  Had Vystar honored the tenth conversion, the Note would have been paid off.  See
EMA Chart of Conversions (reflecting an interest balance prior to the tenth conversion of
$3,572.74).  Therefore, Vystar would not be responsible for 26,748,019 shares, but rather for just
the 20,545,511 shares sought in the tenth conversion.

performance.  The parties' arguments on this score consist of their efforts to imagine what would

have happened if both principal and interest had been included in the notices of conversion as

required by the Note.  EMA provides an analysis that shows if the amounts actually converted

had been broken down into principal and interest, Vystar would have owed more money, and

thus EMA argues that its breach only helped Vystar and therefore could not be material.  See

VYST, T1 Conversions Prorated Between Principal & Interest, annexed as Ex. 1 to Preston

Supp. Decl. (Docket # 235-1) ("EMA Recharacterization Chart").  Vystar provides an analysis

that assumes that EMA would have demanded the same principal amount plus an additional

interest amount.  See Chart 1, annexed as Chart 1 to Roche Supp. Decl., filed Feb. 24, 2023

(Docket # 240) ("Vystar Recharacterization Chart").  Under this analysis, EMA would have

converted more of the Note at each conversion date and thus Vystar would have paid off its loan

sooner, even though it would have paid more money in total.

    We do not find either analysis dispositive.  In our view, the issue of whether a breach is

material should be judged based on the circumstances existing at the time the breach.  At the

time of the breach, a demand by EMA for principal without associated interest could only help

Vystar since interest is calculated based on principal.  See Note at 1 (interest is paid on the

"unpaid principal balance").  Because Vystar has failed to proffer facts that would lead a

reasonable jury to find it was deprived of a benefit under the contract, let alone one that was "the

essential purpose of the contract," the Court cannot find that EMA's breach was material.

Tektree, LLC, 2013 WL 5230705, at *4.  Thus, Vystar's own performance was not excused.

DeMarie v. Neff, 2005 WL 89403, at *4 (Del. Ch. Jan. 12, 2005) ("[A]lthough a material breach

excuses performance of a contract, a nonmaterial  --- or de minimis --- breach will not allow the

non-breaching party to avoid its obligations under the contract.").

For the same reason, we can discern no damage resulted from this breach. The conversion of stock attributable only to principal did not harm Vystar as we just described and thus no damage to Vystar could have resulted. Vystar's own vision of what EMA should have done (i.e., EMA should have added interest to each principal demand) results in the same total of principal and interest owed by Vystar as EMA actually sought to convert in its conversion notices ($80,000.00 in principal and $7,889.03 in interest). Compare Vystar Recharacterization Chart with EMA Chart of Conversions. In other words, even if EMA performed as Vystar indicates EMA should have, Vystar would have owed the exact same dollar amount on the loan. Moreover, had Vystar paid the exact same amount as it did through the life of the loan but that amount was divided into principal and interest, Vystar would have paid $320.39 more in interest. See EMA Chart of Conversions (total interest of $7,889.03); EMA Recharacterization Chart (total interest of $8,209.42). This is due to the decreased pace of amortization on the principal amount. While EMA would have converted fewer shares of Vystar stock according to Vystar's recharacterization, this is sheer happenstance based on the timing of the conversions and the stock price at that time.

In conclusion, EMA's breach either did not impact Vystar as the amount owed under the loan was the same, or benefited Vystar by accelerating the principal reduction, thereby reducing the total interest owed. Accordingly, a reasonable jury could not find that EMA's breach was material or that it caused Vystar any damage.

2. Affirmative Defenses

Vystar asserted eight affirmative defenses outside of the unconscionability defense discussed in section III.B.4 above. See AAC ¶¶ 71-79. These affirmative defenses are: (1) EMA's violations of Federal Securities Laws and acting as an unregistered broker dealer barred

Case 1:19-cv-01545-GWG   Document 251   Filed 11/27/23   Page 23 of 26

EMA's suit; (2) EMA failed to allege all elements of a breach of contract claim; (3) the doctrines of unclean hands, waiver, estoppel, and accord and satisfaction barred EMA's claims; (4) the agreements have an impermissible and unenforceable liquidated damages provision; (5) EMA "failed to perform in compliance with the terms of the agreements by virtue of its failure to properly calculate the payments due and thereafter overcharged Vystar in the amount of 35,000,000 shares"; (6) no balance was due on the remaining conversions, thereby failing to satisfy the condition precedent to effectuate a conversion; (7) EMA "assumed the risk when it effectuated conversions it was not entitled to effectuate and further assumed the risk when created an improper set of calculations of principal and interest balance"; and (8) EMA's "claims are barred by the doctrine of mistake in that it improperly calculated an amount due that was in excess of the loan amount."  Id.

The first affirmative defense relates to violations of Federal Securities Law which mirror claims that were previously dismissed.  See EMA Financial, LLC v. Vystar Corp., Inc., 2021 WL 1177801, at *3 (S.D.N.Y. Mar. 29, 2021).

The second affirmative defense refers to a failure to "allege" all elements of a breach of contract claim, an issue that is not relevant on a motion for summary judgment.

As to the third affirmative defense, Vystar essentially makes a single argument: EMA knew that it was breaching the agreement and that various doctrines preclude them from seeking enforcement.  See Def. Opp. at 32-34.  In support, Vystar cited a comment made by John Scholz indicating that it was EMA's practice to first convert the principal amount on a note before converting the interest.  See Transcript – John Scholz Deposition, annexed as Ex. G to Fleischmann Decl. (Docket # 211-7), at 112.  Vystar failed to provide any argument as to why this statement implicates the doctrines of waiver or estoppel.  As to the doctrine of unclean

hands, the doctrine does not apply where, as here, monetary rather than equitable relief is being sought. See, e.g., Standard Gen. L.P. v. Charney, 2017 WL 6498063, at *25 (Del. Ch. Dec. 19, 2017) (denying defendant's attempt to invoke the doctrine of unclean hands as a defense against a breach of contract claim seeking damages because "the unclean hands doctrine bars equitable, but not legal, relief") (internal quotations omitted).

As to the fourth affirmative defense, related to enforcement of the liquidated damages clause, EMA is not seeking to enforce the liquidated damages provision. See EMA Supp. Mem. at 19 n.8.

The fifth and sixth affirmative defenses relate to the substantive claims for breach of contract and thus do not constitute affirmative defenses. The substance of these arguments was discussed in section III.C.1 above.

Finally, Vystar presents no coherent argument as to why the seventh and eighth affirmative defenses of assumption of risk and the doctrine of mistake apply here.

Accordingly, none of Vystar's affirmative defenses bar EMA's claims.

3. Damages

On September 18, 2018, after Vystar failed to maintain a sufficient reserve of shares, EMA sent a notice by email on September 18, 2018, informing Vystar that its failure constituted an "Event of Default under the Note." Sept. 18, 2018 Email. As already noted, the declaration of the Event of Default meant that the Note was "immediately due and payable" under § 3.16. Note § 3.16 (capitalization omitted). Indeed, as discussed in section III.B.5 above, it was the status of the Note being "immediately due and payable" — yet not fully paid — that allowed the 24% default interest rate to run on the entire balance due and that also allowed EMA to continue

to make stock conversions.  See Note at 1.  Had EMA not notified Vystar it was in default, it would not have been permitted to charge the 24% interest rate.

The effect of the Note being "immediately due and payable," however, meant that Vystar owed the entire remaining balance of the Note as of September 18, 2018, and thus that the Note's restriction on the prepayment of amounts due did not apply.  See Note § 1.8 ("[T]he Borrower shall have no right to prepay this note[.]").  The bar on prepayments did not apply because any payment by Vystar toward the balance of the Note after the September 18, 2018 event of default was not a "prepayment" at all inasmuch as a "prepayment" is the "satisf[action] [of] a debt before its due date."  See "Prepayment Clause," Black's Law Dictionary (10th ed. 2014) (emphasis added).  Here, the balance of the Note was "immediately due and payable" as of September 18, 2018.  Thus, September 18, 2018, was the date on which all payments under the Note were "due."

As of January 15, 2019, after EMA's implementation of nine conversions, the balance of the Note by EMA's own calculation was $3,572.74.  EMA Chart of Conversions (row C10).  The tenth notice of conversion indicated this amount as well as $850 in fees, for a total proposed conversion amount of $4,622.74.  Id.  On January 31, 2019, Vystar wired EMA $4,658.00 as payment of the Note, which EMA received.  See Jan. 30, 2019 Wire.  This amount more than covered the balance due on the Note, and as of January 31, 2019, there was no longer any balance of the Note that was "due and payable" within the meaning of the Note.  Thus, Vystar as of January 31, 2019, no longer owed EMA anything under the Note.  See generally Def. Mem. at

25-26.  Because Vystar owes nothing on the Note, judgment must be entered dismissing EMA's

claims.[10]

Conclusion

For the above reasons, the Court denies EMA's summary judgment motion (Docket #

194) and grants Vystar's summary judgment motion dismissing the complaint (Docket # 191).

The Clerk is requested to enter judgment dismissing this case.[11]

Dated: November 27, 2023November 27, 2023
New York, New York


_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[10]  Vystar's various requests for relief beyond dismissal of the complaint are denied given our conclusion that EMA did not materially breach its obligations.  We do not view the sending of the tenth notice of conversion following Vystar's payment of the balance due as a material breach because the Note was fully paid at that point and thus the notice had no effect.  Vystar's request for punitive damages is rejected because there is no evidence of "wanton or willful disregard" of Vystar's rights by EMA — a factual predicate that Vystar concedes is required for an award of punitive damages.  See Def. Mem. at 29 (quoting Ripsom v. Beaver Blacktop, Inc., 1988 WL 32071, at *16 (Del. Super. Ct. Apr. 26, 1988)).  While EMA incorrectly interpreted the Note to bar Vystar's payment of January 31, 2019, we cannot find that this view and EMA's sending of the subsequent notices of conversion (which were never honored) represented a "wanton or willful disregard" of Vystar's rights.

[11]  Vystar seeks its attorney's fees in this action as permitted by § 4.6 of the Note.  See Def. Mem. at 25.  Pursuant to Fed. R. Civ. P. 54(d), any such application shall be filed within 14 days of the entry of judgment unless an extension is sought and obtained from the Court.